AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>A SAMSUNG CELL PHONE IN A RED CASE, SERIAL NO.<br>R9PN5098N7J, IMEI 351721110198815, CURRENTLY STORED IN A<br>SECURE EVIDENCE LOCKER AT 801 LINN STREET, CINCINNATI,<br>OH 45203 | )<br>)<br>)<br>)<br>)<br>)<br>) Case No. **1:22-MJ-00436** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ❑ contraband, fruits of crime, or other items illegally possessed;
- ❑ property designed for use, intended for use, or used in committing a crime;
- ❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841 and 846, 18<br>U.S.C. 922(g)(1) | Distribution of Controlled Substances; Conspiracy to Commit a Title 21 Offense;<br>Possession of a Firearm by a Prohibited Person |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

- ☑ Continued on the attached sheet.
- ❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Matthew Martin*

*Applicant's signature*

Matthew Martin, Task Force Officer, ATF

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

**FaceTime Video** *(specify reliable electronic means).*

Date: **Jul 22, 2022**

*Stephanie K. Bowman*

*Judge's signature*

City and state: Cincinnati, Ohio

Hon. Stephanie K. Bowman, U.S. Magistrate Judge

*Printed name and title*

## ATTACHMENT A

The property to be searched is a Samsung cell phone in a red case, serial number R9PN5098N7J, IMEI number 351721110198815, hereinafter the "Device." The Device is currently stored in a secure evidence locker at the Cincinnati Police Department located at 801 Linn Street, Cincinnati, OH 45203. The Device is pictured below.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.



## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to violations of 21 U.S.C. §§ 841 and 846 (distribution and possession with intent to distribute a controlled substance and conspiracy to commit a Title 21 offense) and 18 U.S.C. 922(g)(1) (possession of a firearm by a prohibited person) and involve Christopher SISK, and/or others known and unknown, and from on or about September 1, 2020, through the present, including but not limited to communications, photographs, videos, cell phone applications, and other data relating to the following:

      a.   The possession, distribution, and trafficking of controlled substances (as defined under Title 21, United States Code, § 812) by Christopher SISK, and/or coconspirators, in any form, including, but not limited to, cocaine, fentanyl, and heroin;

      b.   Lists of customers and related identifying information;

      c.   Sources of drugs and coconspirators (including names, addresses, phone numbers, or any other identifying information);

      d.   any information recording Christopher SISK's schedule or travel from September 1, 2020, to November 6, 2020;

      e.   all bank records, checks, credit card bills, account information, and other financial records;

      f.   Paraphernalia associated with the manufacture, distribution, sale, import, export, storage, conversion, preparation for sale and use of any controlled substances,

including scales, measuring devices, bottles, balloons, baggies, plastic wrap, plastic envelopes, film canisters and cutting, conversion, and adulteration agents;

g. Currency (whether U.S. or foreign) and financial instruments, including travelers checks, bonds, stock certificates, cashier's checks, certificates of deposit, and money orders, derived from the sale of controlled substances in violation of Title 21, United States Code, § 841 and money wrappers, rubber bands, money containers, and money counting machines;

h. Precious metals, jewelry, art, or other high-value items that could be obtained with the proceeds of the sales of controlled substances;

i. Any and all records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, art, or other high-value items that could be obtained with the proceeds of the sales of controlled substances;

j. Any boxes, bags, briefcases, suitcases, containers, or other items that could be used to mail, carry, import, export, smuggle, or transport marijuana or any other controlled substances;

k. All records, documents, and materials showing control, possession, custody, dominion or other indicia of occupancy over physical premises, including but not limited to: personal mail, checkbooks, personal identification, personal effects, notes, other correspondence, utility and other bills, internet service provider documents, letters, rent receipts, mortgage and loan documents, financial documents, vehicle registration information or ownership warranties and keys;

2

l.   Firearms, ammunition, and firearms accessories, such as magazines, silencers, gun cases, magazines and spare parts, including but not limited to any records relating to a straw purchase of a firearm by B.N. Sisk and/or the illegal possession of a firearm and ammunition by Christopher SISK in or about November 2020;

m.   Firearms source records, including lists of prices, correspondence, notation logs, receipts, journals, books, telephone records, telephone bills, address books, bank statements, and other documents or devises noting the price, quantity, dates, and/or times when firearms were purchased possessed, transferred, distributed or sold;

2.   Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A SAMSUNG CELL PHONE IN A RED CASE, SERIAL NO. R9PN5098N7J, IMEI 351721110198815, CURRENTLY STORED IN A SECURE EVIDENCE LOCKER AT 801 LINN STREET, CINCINNATI, OH 45203 | Case No. __1:22-MJ-00436__ |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Matthew Martin, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—that is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Police Specialist with the Cincinnati Police Department (CPD), and have been so employed since July 1996. I am also a Task Force Officer (TFO) with the Project Safe Neighborhoods, Project Disarm Federal Gun Task Force with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been since January 2002. During the course of my law enforcement career, I have completed various firearms and narcotics trainings. As a TFO with the ATF, my duties and responsibilities include conducting criminal investigations for violations of federal law, particularly those found Title 18 of the United States Code.  During my tenure

with the ATF, I have participated in dozens of criminal investigations seeking evidence of violations of federal firearms and controlled substances offenses. In the course of those investigations, I have obtained, and reviewed the results of, several search warrants for the contents of electronic devices.

3.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.     The property to be searched is a Samsung cell phone in a red case, serial number R9PN5098N7J, IMEI number 351721110198815, hereinafter the "Device." The Device is currently stored in a secure evidence locker at the Cincinnati Police Department located at 801 Linn Street, Cincinnati, OH 45203.

5.     The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6.      I am the case agent for a criminal investigation involving Christopher SISK, a person prohibited from possessing or carrying a firearm due to having at least one prior felony conviction with a potential term of imprisonment of at least one year.

7.     On November 6, 2020, CPD officers arrested Christopher SISK at 966 McPherson Avenue, Cincinnati, which is located in the Southern Judicial District of Ohio, and charged him with unlawful possession of a weapon and drug offenses in violation of Ohio state law. I became aware of this case while reviewing firearm arrests made by CPD.  A record check

revealed that SISK was federally prohibited from possessing the firearms and ammunition recovered during a search warrant on November 6, 2020, at 966 McPherson Avenue.

8.     The investigation that culminated in the November 6, 2020, search and arrest of SISK originated in or about October 2020. At that time, a confidential and reliable informant (CI) for CPD advised officers of an illegal narcotic trafficker nicknamed "Flocka." The CI had Flocka's cell phone number, knew that Flocka operated in the District 3 area of Cincinnati, and advised that Flocka was selling fentanyl. It was determined that officers would initiate an investigation into Flocka involving several "buy-walk" narcotic purchases. On each of the controlled purchases the CI was searched before after the deal for the presence of controlled substances or U.S. currency, with none being found. The CI would then place a call to the cell phone number used by Flocka, and Flocka would instruct the CI on where they would meet. Through investigation, CPD officers eventually identified Flocka as Christopher SISK, which the CI verified by positively identifying the individual he/she knew as Flocka as SISK.

9.     The first controlled buy took place on October 2, 2020, and occurred at 3609 Warsaw Avenue, a Kroger parking lot. SISK arrived in a vehicle, sold fentanyl to the CI, and immediately left the parking lot and drove to the residence located at 966 McPherson Avenue. On October 22, 2020, the CI again called SISK and arranged another sale of fentanyl. This sale also occurred at the Kroger parking lot. SISK arrived in a white Hyundai SUV. The next sale occurred on October 27, 2020, at the same Kroger parking lot. CPD officers observed SISK leave the residence at 966 McPherson Avenue and respond to the parking lot for the deal. Once the fentanyl transaction had occurred, officers observed SISK walking back into the residence at 966 McPherson Avenue. The last deal occurred on November 2, 2020, and was conducted at 974 McPherson Avenue. SISK exited the front door of 966 McPherson Avenue and met the CI.

3

They walked northbound on McPherson Avenue, where the CI provided SISK with U.S. currency in exchange for fentanyl.

10.     On November 6, 2020, officers obtained a search warrant for 966 McPherson Avenue.  Once the warrant was signed, officers set up surveillance on the residence.  Eventually, SISK arrived in the white Hyundai SUV.  He parked the vehicle and entered 966 McPherson Avenue, using a key to unlock the front door.  A few minutes later, SISK exited the residence and got back into the Hyundai.  Officers observed SISK make a hand-to-hand drug deal from the vehicle.  After that deal was done, uniformed officers approached SISK, who was still seated in the SUV, and placed him into custody.

11.     After placing SISK into custody, officers executed the search warrant on 966 McPherson Avenue.  Inside the residence, they found K.A.[1] (SISK's girlfriend) and her three children.  K.A. was asked if there was anything inside the house that should not be.  She stated she had two guns, one in the bedroom and one in her vehicle.  Officers located a firearm in the master bedroom in the nightstand, still inside its original gun box.  The gun box was mixed in with SISK's state ID and his clothing.  Also inside the nightstand, officers located a digital scale with white residue.  K.A. was again asked about the firearm in the bedroom.  She then stated that it was not hers, and that it actually belonged to SISK.  K.A. stated that SISK had bought it from a store.  She once again reiterated that the other firearm found was hers.

12.     The firearm recovered from the bedroom was further described as a 10mm HS Produkt model XDM semi-automatic handgun bearing serial number BY332933 which was loaded with 10mm ammunition. The firearm was transported to the CPD's Criminal

---

[1] Because this individual is not currently charged with a crime, I am using her initials to protect her privacy.

Investigations Section where it was test-fired and did prove to be operable. The firearm information was sent to the National Tracing Center and did show to have been purchased on October 11, 2020, by a B.N. Sisk.[2]  Subsequent analysis identified SISK's fingerprints on the firearm.

13.     The scale and all of the purchased narcotics from the aforementioned controlled buys were sent to the Hamilton County Crime Laboratory for analysis.  The following results were returned from the narcotic analysis of the four controlled purchases and from the white powder recovered during the search warrant on November 6, 2020:

    a.  October 2, 2020: C.L. File # CL20-05936 Report #1, .365 grams of a fentanyl and tramadol mix.

    b.  October 22, 2020: C.L. File # CL20-06420 Report #1, .196 grams of a fentanyl and tramadol mix.

    c.  October 27, 2020: C.L. File # CL20-06522 Report #1, .396 grams of a fentanyl and tramadol mix.

    d.  November 2, 2020: C.L. File # CL20-06658 Report #1, .372 grams of fentanyl.

    e.  November 6, 2020: C.L. File # CL20-06798 Report #1, residue of fentanyl, cocaine, and tramadol.

14.     A description of the HS Produkt 10mm and 10mm ammunition was provided to an instate nexus expert from the ATF.  This expert was able to determine that the firearms and ammunition would have had to affect interstate commerce to be recovered during the search

---

[2] Because this individual is not currently charged with a crime, I am using her initials to protect her privacy

warrant and subsequent arrest of SISK at 966 McPherson Avenue, Cincinnati, Ohio on November 6, 2020.

15.     I performed a record check of Christopher SISK and determined that he has the following prior felony convictions which are punishable by more than a year:

      f.   United States District Court, Southern Judicial District of Ohio case #1:14-CR-113, Hobbs Act Robbery.

      g.   Hamilton County Court of Common Pleas case #B1501874, Aggravated Assault (F4).

      h.   Hamilton County Court of Common Pleas case #B1304619, Weapons under Disability (F3).

16.     When agents arrested SISK and executed the search warrant on November 6, 2020, they also seized SISK's cell phone, a Samsung cell phone in a red case, bearing serial number R9PN5098N7J, IMEI 351721110198815 (the Device). Based on my training and experience, and my knowledge of this investigation, including the fact that video recordings from the controlled purchases show that SISK communicated with the CI by phone, I believe that SISK used the Device to coordinate drug transactions, including those with the confidential informant. I also know, based on my training and experience, that drug traffickers frequently use cell phones to communicate with customers and sources of supply.

17.     I also submit that there is probable cause to believe that the Device likely contains evidence relevant to SISK's possession of the firearm recovered, namely, the 10mm HS Produkt model XDM semi-automatic handgun bearing serial number BY332933. A trace showed that this firearm was purchased by B.N Sisk., a relative of SISK's, less than a month before it was found in his possession. I know based on my training and experience that individuals who may not

legally possess firearms commonly ask friends and relatives to purchase firearms for them. I also know that a "time to crime" (i.e., the time between when a firearm was purchased and when it is found in connection with a crime) is indicative of an illegal straw purchase, that is, a purchase made by one party with the intention of immediately giving the firearm to another party. In this case, based on the short "time to crime" and the fact that the firearm was purchased by SISK's relative, I submit that there is probable cause to believe that the Device will contain communications between SISK and the relative relevant to the straw purchase and to SISK's possession of the firearm, as well as other corroborating evidence such as photographs of the firearm and location data showing that SISK was at or near the store when the firearm was purchased by B.N. Sisk.

18.     The Device is currently in the lawful possession of the Cincinnati Police Department.  As described above, the Device came into the Cincinnati Police Department's possession when it was seized incident to arrest and during the execution of a search warrant. Therefore, while the Cincinnati Police Department might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

19.     The Device is currently in storage at the Cincinnati Police Department's evidence locker located at 801 Linn Street, Cincinnati, OH 45203.  In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the Cincinnati Police Department.

20.     I believe, for the reasons I described above, as well as for the additional reasons I give below, that the Device will contain evidence related to drug trafficking and the possession of a firearm. Based on my training and experience, as well as my discussions with other law enforcement agents, I know the following:

a)     Drug dealers often maintain documents pertaining to the possession, importation, exportation, and/or distribution of controlled substances and illegal proceeds, including invoices, shipping labels, tracking numbers, boxes, and envelopes at their residences, stash houses, and/or in their vehicles where they are available for reference and concealed from law enforcement; and it is common to find photos or other records relating to these items on any electronic devices used;

b)     It is also common to find on drug dealers' electronic devices, including smart phones, photos, videos, communications, location data, and other records and information relating to the following common practices of drug dealers:

i.     Drug dealers commonly store drugs and drug paraphernalia, including pipes, syringes, and rolling papers, in their residences, stash houses, and/or vehicles in order to have ready access to the drugs and/or paraphernalia in order to conduct their drug dealing business or to use those drugs personally;

ii.     Drug dealers attempt to mask the distinct odors of particular drugs through the use of heat sealing and/or canning devices and/or aromatic substances such as laundry soap, dryer sheets, air fresheners, or axle grease;

iii.     Drug dealers often dilute, or "cut," drugs in order to maximize the volume of drugs they have to sell, and thus their profits. Drug dealers use various

8

substances to dilute drugs, including mannitol, mannite, lactose, Vitamin B12, and MSM. Drug dealers use equipment, such as scales, sifters, hammers, grinders, razor blades, glass panes, mirrors and kilo or pound presses as part of the dilution or "cutting" process. Once the drug has been "cut," drug dealers usually will repackage it, often in smaller quantities, using masking agents, tape, heat sealers and heat sealed bags, ziplocs bags, paper bindles, and/or other containers for redistribution. It is common for drug dealers to maintain such equipment and supplies in their residences and stash houses;

iv.  Drug dealers keep books, receipts, notes, ledgers and other forms of records specifically relating to their drug distribution activities. Because drug dealers often "front" drugs to their customers – that is, sell the drugs on credit – or receive drugs from their suppliers on credit, such documentation is necessary to keep track of the amounts paid and owed with respect to their customers and suppliers. These ledgers are more commonly known as "pay/owe sheets" and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets, and are frequently encoded in order to protect those involved. Drug dealers often keep such records on their person or in their residences, stash houses, and/or vehicles;

v.  Drug dealing is a cash business. Customers pay for drugs with cash and dealers commonly purchase drugs from their suppliers with cash. Drug dealers commonly keep large sums of currency, financial instruments,

9

precious metals, jewelry, and other items of value which represent either the proceeds from drug sales or are intended for the purchase of controlled substances.  When drug dealers amass such wealth, they often attempt to legitimize that wealth or otherwise conceal it and its origin from discovery by law enforcement.  To accomplish this, drug dealers often use different techniques, including the use of foreign and domestic banks and their attendant services, including savings and checking accounts, securities, cashier's checks, money drafts and letters of credit to exchange drug proceeds into money that appears to come from a legitimate source.  Drug dealers also purchase real estate or vehicles, and establish shell corporations and business fronts that they use to launder drug proceeds. Drug dealers often utilize fictitious or "straw-holder" owners to conceal the true ownership, vehicles, or other valuable items purchased with the proceeds of illicit drug sales.  In addition, drug dealers often use wire transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution business.  Drug dealers often keep these items of value, and records relating to them, on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available.

vi.    Drug dealers go to great lengths to hide and secure the drugs, drug proceeds, other items of value and records relating to their drug business. This is to safeguard those items against robbery and keep them from law enforcement.  These secure locations typically include safes, vaults, or

10

other locked containers, as well as specially constructed concealed compartments such as those often found in vehicles used specifically to facilitate drug dealing. Other methods of concealment include the burial of such items underground, the use of locked vehicles, trailers, out buildings, sheds, and/or exterior closets, the use of natural spaces within walls, furniture, vehicles, and other areas, and the use of sealed cans and canning machines;

vii. Drug dealers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money to various points within the United States. They do so, at least in part, due to the convenience of the service and the availability of related internet and phone tracking services, speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another. They often use hand-written airbills, drop the packages near closing time, pay for such services in cash and utilize false or nominee names, addresses, and/or telephone numbers when using such services in order to further insulate themselves from detection by law enforcement. Drug dealers frequently maintain records relating to their use of these services, such as receipts, copies of airbills, empty and/or previously used boxes, packing tape, packing popcorn/filler and other packaging materials, and package tracking records printed from the internet, at their residences, stash houses, and/or in their vehicles where they are available for reference.

11

viii.    Drug dealing is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package and deliver the drugs and persons to launder the drug proceeds. These persons frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses, sometimes encoded and sometimes not encoded, for the purpose of contacting their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. These records are typically maintained on their person or in their residences, stash houses, and/or vehicles, so they are readily available in order to efficiently conduct their drug dealing business. Moreover, such records are often stored electronically within the memory of telephones, computers, and/or personal digital assistants such as iPhone and Blackberry devices;

ix.    Drug dealers often use cellular telephones, satellite telephones, pagers and text messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and/or personal digital assistants such as iPhone and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. Drug dealers often keep these items on their person or in their residences, stash houses, businesses, and/or vehicles where they are readily available;

x.    Drug dealers often travel by car, bus, train, or airplane, both domestically

12

and to and/or within foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, or to transport drugs or drug proceeds. Documents relating to such travel, such as calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent use club membership information and records associated with airlines, rental car companies, and/or hotels, airline, hotel and rental car receipts, credit card bills and receipts, photographs, videos, passports, and visas, are often maintained by drug dealers in their residences, stash houses, and/or vehicles where they are readily available for use or reference;

xi.    Drug dealers frequently possess firearms, ammunition, silencers, explosives, incendiary devices, and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take such items and/or harm them during transactions. Such weapons, which are often stolen or otherwise possessed illegally, are typically maintained on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available;

xii.    Drug dealers often utilize two-way radios, police scanners, video surveillance systems, and other counter surveillance equipment to prevent detection by law enforcement, and that such items are typically maintained at their residences, stash houses, and/or in their vehicles.

xiii.    Drug dealers frequently take, or cause to be taken, photographs and/or

videos of themselves, their criminal associates, their real and personal property, their weapons, and their drugs; and such items are often stored on their person, in their residences, and/or vehicles.

## TECHNICAL TERMS

21.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

14

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved

15

in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

22.     Based on my training and experience, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

23.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

24.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

17

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

25. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

18

26.     *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

27.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

## REQUEST FOR SEALING

28.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation into SISK and into the person who purchased the firearm for him, B.N. Sisk. B.N. Sisk likely does not realize that she is the subject of an ongoing investigation. If she learns of the investigation, B.N. Sisk may take steps to destroy evidence, including evidence saved to her electronic devices and online accounts. Premature disclosure of the contents of this affidavit and related documents therefore may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

*Matthew Martin*
_____
Matthew Martin
Task Force Officer
ATF

Subscribed and sworn to before me
on July 22, 2022:**via electronic means, specifically Facetime video.**

*Stephanie K. Bowman*
_____
STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE

20

## ATTACHMENT A

The property to be searched is a Samsung cell phone in a red case, serial number R9PN5098N7J, IMEI number 351721110198815, hereinafter the "Device." The Device is currently stored in a secure evidence locker at the Cincinnati Police Department located at 801 Linn Street, Cincinnati, OH 45203. The Device is pictured below.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.



## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to violations of 21 U.S.C. §§ 841 and 846 (distribution and possession with intent to distribute a controlled substance and conspiracy to commit a Title 21 offense) and 18 U.S.C. 922(g)(1) (possession of a firearm by a prohibited person) and involve Christopher SISK, and/or others known and unknown, and from on or about September 1, 2020, through the present, including but not limited to communications, photographs, videos, cell phone applications, and other data relating to the following:

      a.   The possession, distribution, and trafficking of controlled substances (as defined under Title 21, United States Code, § 812) by Christopher SISK, and/or coconspirators, in any form, including, but not limited to, cocaine, fentanyl, and heroin;

      b.   Lists of customers and related identifying information;

      c.   Sources of drugs and coconspirators (including names, addresses, phone numbers, or any other identifying information);

      d.   any information recording Christopher SISK's schedule or travel from September 1, 2020, to November 6, 2020;

      e.   all bank records, checks, credit card bills, account information, and other financial records;

      f.   Paraphernalia associated with the manufacture, distribution, sale, import, export, storage, conversion, preparation for sale and use of any controlled substances,

including scales, measuring devices, bottles, balloons, baggies, plastic wrap, plastic envelopes, film canisters and cutting, conversion, and adulteration agents;

g. Currency (whether U.S. or foreign) and financial instruments, including travelers checks, bonds, stock certificates, cashier's checks, certificates of deposit, and money orders, derived from the sale of controlled substances in violation of Title 21, United States Code, § 841 and money wrappers, rubber bands, money containers, and money counting machines;

h. Precious metals, jewelry, art, or other high-value items that could be obtained with the proceeds of the sales of controlled substances;

i. Any and all records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, art, or other high-value items that could be obtained with the proceeds of the sales of controlled substances;

j. Any boxes, bags, briefcases, suitcases, containers, or other items that could be used to mail, carry, import, export, smuggle, or transport marijuana or any other controlled substances;

k. All records, documents, and materials showing control, possession, custody, dominion or other indicia of occupancy over physical premises, including but not limited to: personal mail, checkbooks, personal identification, personal effects, notes, other correspondence, utility and other bills, internet service provider documents, letters, rent receipts, mortgage and loan documents, financial documents, vehicle registration information or ownership warranties and keys;

2

l. Firearms, ammunition, and firearms accessories, such as magazines, silencers, gun cases, magazines and spare parts, including but not limited to any records relating to a straw purchase of a firearm by B.N. Sisk and/or the illegal possession of a firearm and ammunition by Christopher SISK in or about November 2020;

m. Firearms source records, including lists of prices, correspondence, notation logs, receipts, journals, books, telephone records, telephone bills, address books, bank statements, and other documents or devises noting the price, quantity, dates, and/or times when firearms were purchased possessed, transferred, distributed or sold;

2.  Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3